FILED

2024 Mar-26  PM 01:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| SHELBY HODGE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 5:23-cv-00155-NAD |
| | ) |
| SOCIAL SECURITY | ) |
| ADMINISTRATION, | ) |
| COMMISSIONER, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER
<u>AFFIRMING THE DECISION OF THE COMMISSIONER</u>**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Shelby Hodge appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits. Doc. 1. Plaintiff Hodge applied for supplemental security income (SSI) benefits with an application date of December 7, 2020, and an alleged onset date of June 1, 1998. Doc. 9-4 at 2; Doc. 9-7 at 2–13. The Commissioner denied Hodge's claim for benefits. Doc. 9-3 at 7–9, 23–45.

In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 12; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73. After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Hodge argues that the court should reverse and remand because the determination by the Administrative Law Judge (ALJ) of Hodge's residual functional capacity (RFC) is "inadequate and not supported by substantial evidence," as the ALJ "failed to properly evaluate the Plaintiff's complaints consistent with the Eleventh Circuit pain standard."  Doc. 15 at 5.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:   (1) initial determination, including

reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)  whether the claimant is engaged in substantial gainful activity;

(2)  if not, whether the claimant has a severe impairment or combination of impairments;

(3)  if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)  if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)  if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018)

(quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).   If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs.  *Id.*  So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant.  *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards."  *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**   With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner.  *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835,

838 (11th Cir. 1982) (similar).  If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings."  *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding."  *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).  "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion."  *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.**  With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Hodge's personal and medical history

Hodge was born on January 15, 1971.  Doc. 9-3 at 58.  In 2009, he was in a car accident; Hodge's wife died in the accident, and Hodge fractured his hip, pelvis, and spine.  Doc. 9-3 at 59; Doc. 9-10 at 58.

Throughout 2015 and into January 2016, Hodge presented to Central North Alabama Health Services with chronic hip and back pain, which he was directed to treat with medication.  Doc. 9-9 at 5–17.

On May 24, 2019, Hodge presented to the Huntsville Hospital emergency department with head pain based on a head injury from 4 weeks prior that had required stitches and staples; he wanted the stitches and staples removed.  Doc. 9-9 at 75–76.  Hodge was alert and oriented and walked without assistance.  Doc. 9-9 at 76.  Hodge was cooperative, not in any acute distress or discomfort, had clear speech with normal affect and orientation, and was able to respond appropriately.  Doc. 9-9 at 76.

On December 1, 2020, Hodge presented to the Huntsville Hospital emergency department and was sent to the behavioral sciences department for a psychiatric evaluation.  Doc. 9-9 at 81.  Hodge was noncompliant with his medication for bipolar disorder and schizophrenia and was not able to stay focused in order to have a conversation; he was having auditory and visual hallucinations but no suicidal ideation.  Doc. 9-9 at 87.  Hodge had pressured speech amounting to "word salad" and an agitated affect.  Doc. 9-9 at 87.  Hodge stated that he "never" engaged in substance abuse.  Doc. 9-9 at 87.  His psychosis was noted to be worsening due to noncompliance with medication.  Doc. 9-9 at 88.  Hodge was diagnosed with psychosis and was voluntarily admitted.  Doc. 9-9 at 93.  He was discharged against

medical advice on December 3, 2020.  Doc. 9-9 at 83.  Hodge was discharged with prescriptions for Depakote, Olanzapine, and paliperidone (a monthly injection). Doc. 9-9 at 95.

On December 11, 2020, Hodge reported to the Crestwood Medical Center emergency department with back pain and requested a shot of Toradol for pain.  Doc. 9-10 at 116.  His behavior was appropriate, alert, cooperative, and oriented.  Doc. 9-10 at 119.  He said he had pain in his back and right hip at a level of 10 out of 10. Doc. 9-10 at 120.  Imaging showed mild degenerative changes in his lumbar spine. Doc. 9-10 at 122.

On December 14, 2020, Hodge reported to the Huntsville Hospital emergency department with "generalized achiness" and back and hip pain from his previous injuries in 2009; he also stated that he was homeless and asked about laundry services and food.  Doc. 9-9 at 69–70.  Hodge was well nourished, awake and alert, cooperative, not in acute distress, and able to ambulate without difficulty.  Doc. 9-9 at 71.  His physical examination was normal.  Doc. 9-9 at 71.  He was diagnosed with arthritis/chronic pain and homelessness.  Doc. 9-9 at 71.

On December 15, 2020, Hodge reported to the Crestwood Medical Center emergency department with chronic pain in his right hip that was worse because of cold weather and because he was homeless.  Doc. 9-10 at 108.  He also had low back pain, but his range of motion was normal.  Doc. 9-10 at 108.  He was diagnosed with

arthritis, bursitis, and strain of his hip along with degenerative changes.  Doc. 9-10 at 109, 114.  Hodge requested a shot of Toradol for pain.  Doc. 9-10 at 111.

On December 16, 2020, Hodge saw Dr. Berenice Serpas at the Huntsville Family Health Center for his bipolar disorder.  Doc. 9-9 at 111.  He said he was taking medication given to him by his sister, but he did not know what medication.  Doc. 9-9 at 111.  The doctor could not complete a physical examination.  Doc. 9-9 at 112.  Hodge requested "pain pills" but was told he would need a chaperone in order to receive pain medication.  Doc. 9-9 at 112.

On December 17, 2020, Hodge presented at the Huntsville Hospital emergency department for a psychiatric evaluation asking to be admitted to the psychiatric floor based on homelessness and not having anywhere to go; he then threatened to maybe "jump off a bridge or something."  Doc. 9-9 at 51–52.  Hodge was noncompliant with previous treatment recommendations and was not taking his psychiatric medication.  Doc. 9-9 at 52.  Hodge complained of increased anxiety and depression and reported auditory and visual hallucinations at night.  Doc. 9-9 at 53.  His physical examination was normal.  Doc. 9-9 at 53.  Hodge stated that he wanted to go back on his medication so that he could get off the streets, and said that he was doing well otherwise.  Doc. 9-9 at 58–59.  He denied active hallucinations at the time of examination and was "calm and appropriate" with "linear and organized" thoughts.  Doc. 9-9 at 59.  A "psych screener disposition" from that same day noted

that Hodge's diagnosis was "malingering."  Doc. 9-9 at 64.

On December 22, 2020, Hodge presented at the Huntsville Hospital emergency department complaining of chronic lower back and hip pain that had been exacerbated by sleeping on the concrete floor at a homeless shelter.  Doc. 9-9 at 45–46.  However, Hodge also reported that he had back and hip pain because he fell off a bicycle.  Doc. 9-9 at 46.  Hodge was ambulatory but admitted that he was not taking his bipolar medication; he had a bizarre affect and was "talking non-stop."  Doc. 9-9 at 46.  The records show that Hodge appeared to be having a "flight of ideas" as he was speaking rapidly and changing the subject.  Doc. 9-9 at 46.  Hodge appeared well nourished, alert and oriented, cooperative, and was not in obvious discomfort; he had rapid speech but was oriented and his responses were generally appropriate.  Doc. 9-9 at 47.  Hodge had full range of motion but "mild discomfort" in his right hip.  Doc. 9-9 at 47.

On December 29, 2020, Hodge went to the Huntsville Hospital emergency department complaining of issues with his teeth and pain in his right hip.  Doc. 9-9 at 35–38.  Hodge stated that he had suffered hip pain since his car accident in 2009.  Doc. 9-9 at 38.  The record notes that it was "unclear if patient has had recent injury or trauma to his hip as he is having flight of ideas on exam."  Doc. 9-9 at 38.  A hip x-ray showed "moderate to severe osteoarthritis of the right hip" and "postsurgical changes within the pelvis."  Doc. 9-9 at 39.  Hodge appeared well nourished, awake

and alert, cooperative, ambulatory, and had clear but rapid speech and good orientation. Doc. 9-9 at 39. Hodge was taking Depakote, Olanzapine, and paliperidone psychiatric medications at the time. Doc. 9-9 at 42.

On December 31, 2020, Hodge presented to the Crestwood Medical Center emergency department with bipolar disorder, hip pain, high blood pressure, and diarrhea. Doc. 9-10 at 101. He was not taking his psychiatric medication. Doc. 9-10 at 101. He was concerned about getting COVID at "the mission." Doc. 9-10 at 101. He was anxious but otherwise had normal mentation and memory. Doc. 9-10 at 102. He was diagnosed with arthritis pain and medication noncompliance. Doc. 9-10 at 102.

On January 17, 2021, Hodge reported to the Huntsville Hospital emergency department complaining of right hip pain after he fell "while working at the mission" and "hurt his hip again" after prior injuries in 2009. Doc. 9-9 at 26–27. The records note that Hodge had a history of disability, bipolar, anxiety, schizophrenia, ADHD, and homelessness, and had a car accident in 2009 that injured his pelvis. Doc. 9-9 at 27. Hodge reported that he accidentally slipped while working at the mission and fell on his right hip. Doc. 9-9 at 27. Hodge was able to stand and walk at the scene of the accident and at the hospital. Doc. 9-9 at 27. Hodge told the physician that he needed to be admitted because he was suicidal, but could not "give a specific plan" or explain why he was suicidal. Doc. 9-9 at 27. Hodge then asked to be admitted

because he was homeless and it was cold outside.  Doc. 9-9 at 27.  Hodge was alert and oriented upon three checks and walked without assistance.  Doc. 9-9 at 27. Hodge's appearance was "[c]hronically ill appearing, disheveled, foul-smelling, homeless, alert, awake, cooperative, no acute distress."  Doc. 9-9 at 28.  He had clear speech and orientation but a noted "bizarre affect," though later notes showed normal affect.  Doc. 9-9 at 28.  An x-ray of Hodge's hip was "normal" and Hodge "look[ed] just fine[,] he walks well."  Doc. 9-9 at 28.  One diagnosis considered at the visit was "malingering."  Doc. 9-9 at 29.

On January 28, 2021, Hodge filled out an adult disability report.  Doc. 9-8 at 2.  He stated that he could read and write more than just his name.  Doc. 9-8 at 2. He listed that he suffered from bipolar, schizophrenia, and delusions.  Doc. 9-8 at 3. He said that he stopped working on May 1, 1998, because of his conditions.  Doc. 9-8 at 3.  Hodge stated that he was a residential painter before then.  Doc. 9-8 at 4. He stated that he was taking Divalproex and Olanzapine for his mental health conditions.  Doc. 9-8 at 5.

On February 26, 2021, Hodge presented to the Crestwood Medical Center emergency department requesting refills of his psychiatric medications and medication for joint pain.  Doc. 9-10 at 94.  Hodge was negative for anxiety, depression, and hallucinations.  Doc. 9-10 at 94.  He was pleasant and cooperative with a calm affect and good orientation, but he had "flight of ideas" and could not

concentrate.  Doc. 9-10 at 95.  He reported that he was out of his medication and that he fell at the bicycle shop and hurt his hip.  Doc. 9-10 at 97.  He stated that his hip pain was at a 6 or 8 out of 10.  Doc. 9-10 at 97–98.  His gait was not impaired and was normal.  Doc. 9-10 at 98.

On February 28, 2021, Hodge filled out an adult function report.  Doc. 9-8 at 18–25.  He stated that he has a plate in his head and problems with his spine and hip from his car accident in 2009.  Doc. 9-8 at 18.  He stated that he lives in a house with his sister.  Doc. 9-8 at 18.  He stated that his conditions affect his ability to do "anything" and "all" his abilities to conduct personal care, without further specific elaboration.  Doc. 9-8 at 19.  He stated that he needed reminders to cook and take his medication, but also stated that he did not prepare his own meals.  Doc. 9-8 at 20.  He did not provide an explanation for why he could not prepare his own meals beyond the word "wash."  Doc. 9-8 at 20.

Hodge did not address whether he did any chores, but checked a box that he needed encouragement to do chores, and said that he went outside once per day "for trash."  Doc. 9-8 at 20–21.  He stated that he travelled by walking or riding a bicycle because he did not know how to drive.  Doc. 9-8 at 21.  Hodge stated that he shopped for food, but wrote "cant" in answer to how often and how long he shopped.  Doc. 9-8 at 21.  He stated that he was not able to handle money and that his sister helped him.  Doc. 9-8 at 21.  Hodge listed "fishing" as a hobby.  Doc. 9-8 at 22.  Under

questions about social activities, Hodge wrote that he could not read.  Doc. 9-8 at 22.  He also stated that he needed his sister to accompany him places and that he had problems getting along with people.  Doc. 9-8 at 22.  In answer to whether there had been any change in his social activities since his conditions began, Hodge wrote "need education."  Doc. 9-8 at 22.  Hodge checked every box in the list of abilities that his conditions affected.  Doc. 9-8 at 23.  He stated that he cannot walk far, can only pay attention "just a little," and finds it very hard to follow written instructions.  Doc. 9-8 at 23.  He stated that he had previously been fired for failing to interact well with people and that he did not handle stress well.  Doc. 9-8 at 24.

Also on February 28, 2021, Angie Westrope—Hodge's sister—filled out a third-party adult function report.  Doc. 9-8 at 29.  Westrope stated that Hodge lived in her house with her.  Doc. 9-8 at 29.  She stated that Hodge cannot work because he is "like a kid mentally" and has plates in his head and hip.  Doc. 9-8 at 29.  She stated that Hodge did not "know much about caring for himself" and tended to spend his days talking to himself and to people who were not there.  Doc. 9-8 at 30.  She stated that Hodge does not sleep much without medication, but has no problem with personal care.  Doc. 9-8 at 30.  However, she stated that he needs reminders to change clothes after he showers, and that she has to give him his medication.  Doc. 9-8 at 31.  She stated that he can prepare his own meals but only sandwiches, whereas he used to be able to make full meals.  Doc. 9-8 at 31.  She stated that he does not

13

remember how to do chores and never finishes tasks, and that she has to tell him to pick up his belongings "like a kid."  Doc. 9-8 at 31.  She stated that he can shop in stores for "junk food" when he goes with her to go shopping.  Doc. 9-8 at 32. Westrope said that Hodge cannot handle money except to count change, and will "blow" money or give it away.  Doc. 9-8 at 32.  She stated that his hobbies included fishing, watching television, and "playing with toys," and that he did those things daily.  Doc. 9-8 at 33.  She stated that Hodge "talks fast and makes no sense," cannot socialize without her, and cannot get along with people because he says "ugly" things and "cusses people out."  Doc. 9-8 at 34.  She stated that he "doesn't know how to do the things he used to do" and that his conditions affect all of his abilities except for hearing, seeing, and using his hands.  Doc. 9-8 at 34.  Westrope stated that Hodge's back and hip hurt all the time, that he can only walk about a block, that he can only pay attention for a "couple minutes," that he does not finish what he starts, and that he cannot read well.  Doc. 9-8 at 34.  She stated that he could follow spoken instructions "okay sometimes."  Doc. 9-8 at 34.  She stated that he did not handle stress well and that his ability to handle changes in routine depended on his mood.  Doc. 9-8 at 35.

On March 22, 2021, Hodge reported to the Crestwood Medical Center emergency department with hip pain and a request for a medication refill.  Doc. 9-10 at 86, 89.  He stated that his hip was hurting after helping his sister "move some

plants around." Doc. 9-10 at 89. He stated that his pain was at a 6 or 8 out of 10. Doc. 9-10 at 86, 89. He had a normal gait but pain and decreased range of motion in his right hip. Doc. 9-10 at 86. Hodge was "pleasant, cooperative" with a calm affect, and had good orientation, and normal judgment/insight. Doc. 9-10 at 86. Hodge denied using drugs. Doc. 9-10 at 89. No cognitive or functional deficits were noted. Doc. 9-10 at 91. Hodge was diagnosed with arthritis, bursitis, and strain in his hip, and his psychiatric medications were refilled. Doc. 9-10 at 87.

On April 1, 2021, Hodge had a telehealth visit with Jasmine Milloy at Wellstone Medical for outpatient therapy. Doc. 9-10 at 2. Hodge had an appropriate mood/affect, normal orientation, and was "alert, somewhat engaged and presented with congruent thought process." Doc. 9-10 at 3. Hodge's sister was present at the session and described Hodge as being "manic at times" and not getting good sleep. Doc. 9-10 at 4. Hodge stated that his anxiety was "over the roof" and that he generally watched television in his room until his sister got home. Doc. 9-10 at 4. Hodge was experiencing auditory hallucinations but not delusions. Doc. 9-10 at 4. Hodge stated that he was compliant with his medication. Doc. 9-10 at 4.

On April 5, 2021, Hodge saw nurse practitioner Ian Kinzer at Wellstone Medical, stating that he had "a lot of problems." Doc. 9-10 at 45. Hodge could not coherently describe his symptoms, and said that he was hearing voices "all the time" and "seeing things" and they talked to him about "stealing people's wallets and

magic brooms."  Doc. 9-10 at 45.  He was not compliant with his medication and appeared delusional and disorganized.  Doc. 9-10 at 45.  Hodge reported anger issues and a history of homelessness as well as bipolar disorder and schizophrenia.  Doc. 9-10 at 45.  Hodge was anxious and restless.  Doc. 9-10 at 46.  Hodge reported using crystal meth in his twenties and most recently four months previously, though he had previously denied a history of substance abuse.  Doc. 9-10 at 45, 47.  He was diagnosed with uncontrolled schizophrenia.  Doc. 9-10 at 48.  Hodge was described as unkempt but cooperative, alert, oriented, and appropriate with non-linear, illogical, and tangential thought processes, anxious irritable mood, and poor judgment and insight.  Doc. 9-10 at 49.  Hodge's medication was changed and increased.  Doc. 9-10 at 49.

On May 17, 2021, Hodge saw nurse practitioner Ian Kinzer at Wellstone Medical, stating that he needed "something for [his] nerves."  Doc. 9-10 at 39.  Hodge reported hallucinations and paranoia, as well as high anxiety and depression.  Doc. 9-10 at 39.  Hodge reported that he had taken a trip to Mobile and Pensacola to try to find work, but came back after "getting ripped off" and deciding that the homeless shelters there were not as nice.  Doc. 9-10 at 39.  Hodge's sister reported that Hodge walked around manically and had delusional thought content and constant shaking.  Doc. 9-10 at 39.  However, Hodge's erratic behavior was somewhat improved.  Doc. 9-10 at 39.  Hodge's schizoaffective disorder was listed

as "not controlled"; he was cooperative and had appropriate behavior but had pressured speech and illogical tangential thought processes.  Doc. 9-10 at 42. Seroquel was added to his medication regimen and he was directed to continue taking Depakote.  Doc. 9-10 at 43.

On May 25, 2021, Hodge saw Jasmine Milloy at Wellstone Medical.  Doc. 9-10 at 5.  He had appropriate affect/mood and normal orientation, he was "alert, engaged and presented with a congruent thought process."  Doc. 9-10 at 6.  Hodge reported that he was "doing well" and that his mood was stable and his "only concern is not sleeping."  Doc. 9-10 at 7.  Hodge stated that he "helps his sister around the house with chores to keep himself busy."  Doc. 9-10 at 7.  He denied hallucinations or delusions and reported that he was compliant with his medication.  Doc. 9-10 at 7.

On May 29, 2021, Hodge underwent a consultative examination with nurse practitioner James Van Hise.  Doc. 9-10 at 58–64.  Van Hise noted that Hodge was taking multiple medications, including mental health injections every four weeks, and that he suffered from bipolar disorder, schizophrenia, delusions, and lower back pain.  Doc. 9-10 at 58.  Hodge reported that schizophrenia and delusions had the greatest impact on his life, that he heard voices mostly while alone, and that he had frequent anxiety and panic attacks around groups of people.  Doc. 9-10 at 58.  Hodge stated that his medication helped reduce his anxiety and hallucinations but gave him

17

dry mouth—which Van Hise stated did not limit his ability to take the medication. Doc. 9-10 at 58.  Hodge stated that he was in a car accident in 2009, in which his wife had died and he had fractured his hip, pelvis, and spine, and that he still had pain in his lower back and legs at a level of 8 out of 10.  Doc. 9-10 at 58.  Van Hise reported that Hodge was rambling and off topic and needed to be refocused.  Doc. 9-10.

Van Hise noted that Hodge had "no difficulty" with sitting, standing, or walking, and was able to independently cook/meal prep, bathe and dress, and do laundry and housekeeping, but he needed assistance with shopping, banking, and driving.  Doc. 9-10 at 59.  Hodge appeared well groomed, alert, and oriented, and was cooperative and appropriate.  Doc. 9-10 at 59.  He had no paraspinal tenderness in his back and had negative straight leg raise.  Doc. 9-10 at 60.  He had normal strength, dexterity, and sensation.  Doc. 9-10 at 60.  He had no difficulty getting on and off an examination table, walking on his heels, walking on his toes, or squatting and rising, and had normal gait and station.  Doc. 9-10 at 61.  He did not use any assistance device.  Doc. 9-10 at 61.  Hodge had normal range of motion.  Doc. 9-10 at 61–63.

Van Hise filled out a medical source statement opining that Hodge had no limitations in sitting or standing and could perform those actions continuously, had no limitations in walking, had no limitations in lifting and carrying and could carry

around an estimated 10 to 15 pounds continuously on both sides, and had psychological limitations due to auditory hallucinations and an inability to stay focused on conversations.  Doc. 9-10 at 63.

On June 21, 2021, Hodge saw nurse practitioner Ian Kinzer at Wellstone Medical, reporting that he was "antsy" and could not sit still.  Doc. 9-10 at 33. Otherwise, Hodge reported doing "okay" and having a fair mood, though he had "frequent pacing" and "fidgeting" legs.  Doc. 9-10 at 33.  He had difficulty sleeping and spent his time "hanging out at the house, watching tv, doing dishes, cutting the grass."  Doc. 9-10 at 33.  Hodge's sister reported that Hodge was "doing much better" but was "still like a toddler" with poor impulse control and a tendency to say offensive things, and that she had to re-do the chores he did.  Doc. 9-10 at 33.  Hodge had a history of chronic pain but "no mobility limitations."  Doc. 9-10 at 33–34. Hodge was taking psychiatric medications including Depakote and Seroquel.  Doc. 9-10 at 34.  Hodge was diagnosed with stable schizophrenia.  Doc. 9-10 at 35.  He was cooperative, alert, and coherent with appropriate behavior and linear, logical thought but an anxious mood.  Doc. 9-10 at 36.

On June 29, 2021, Hodge had a mental health consultative examination with Jack Bentley, Ph.D.  Doc. 9-10 at 66.  Bentley stated that Hodge suffered from a chronic pain syndrome after his car accident injuries in 2009.  Doc. 9-10 at 66. Bentley noted that Hodge had some arthritis in his right hip and degenerative disc

disease in his back.  Doc. 9-10 at 66.  Bentley noted that Hodge had suffered a traumatic brain injury in 2018 after being attacked with a piece of rebar.  Doc. 9-10 at 66.  Bentley noted that Hodge had PTSD from his 2009 car accident and had panic attacks in public places.  Doc. 9-10 at 66.  Bentley stated that Hodge reported taking Toradol for his physical pain, and psychiatric medications that "only slightly improve his symptoms," and that Hodge was hospitalized for psychiatric reasons in 2020 but left after 3 days against medical advice.  Doc. 9-10 at 66.  Bentley noted that Hodge had a traumatic youth, and that Hodge described himself as a "slow learner" and "barely literate."  Doc. 9-10 at 67.  Bentley stated that Hodge was last employed in 2009 as a residential painter.  Doc. 9-10 at 67.

Bentley performed a mental status examination.  Doc. 9-10 at 67.  Hodge's appearance was disheveled and his grooming was poor; he also showed "numerous pain related behaviors during the interview."  Doc. 9-10 at 67.  Bentley stated that Hodge appeared to be a low functioning adult, but that there were no limitations in his receptive or expressive communication skills and that his memory was intact.  Doc. 9-10 at 67.  His mood was dysphoric, as was his affect, and he showed anxiety and agitation when discussing his 2009 car accident.  Doc. 9-10 at 67.  Hodge "did not exhibit any unusual or peculiar behaviors" and showed "no evidence of bizarre mentation."  Doc. 9-10 at 67.  Bentley noted evidence of moderate to severe sleep disturbance.  Doc. 9-10 at 67.  Bentley stated that Hodge "rarely attends church" and

that he is usually socially isolated because most of his friends are deceased, so he mostly socialized with his sister.  Doc. 9-10 at 67.  Bentley stated that Hodge completes activities of daily living with no assistance but denied specific hobbies. Doc. 9-10 at 67.

Bentley diagnosed Hodge with PTSD, probable borderline intellectual functioning, depressive disorder with anxiety, and orthopedic injuries sustained in his car accident.  Doc. 9-10 at 67.  Bentley opined that Hodge was competent to manage funds, that his prognosis for his current level of functioning was favorable, and that there was no evidence of symptom exaggeration.  Doc. 9-10 at 68.  Bentley stated that Hodge would have "marked limitations in his ability to perform complex or repetitive work-related activities" and moderate limitation for simple tasks and in his ability to communicate with coworkers and supervisors.  Doc. 9-10 at 68. Bentley stated that "most of [Hodge's] work related restrictions would stem from his numerous health problems rather [than] psychiatric symptoms" and those limitations would need to be addressed by a physician.  Doc. 9-10 at 68.

On August 2, 2021, Hodge saw nurse practitioner Ian Kinzer at Wellstone Medical, stating that he was doing "pretty good" but was having problems sleeping. Doc. 9-10 at 26.  He reported some mood swings but denied hallucinations or paranoia.  Doc. 9-10 at 26.  He reported frequent anxiety and nervousness and shaking in his hands.  Doc. 9-10 at 26.  Hodge's sister reported that he was "doing

much better" and had "much more reality-based" conversations, and he was "even preparing food for himself."  Doc. 9-10 at 27.  Hodge reported pacing and leg shaking, but said he experienced those things before starting his psychiatric medication.  Doc. 9-10 at 27.  He stated that he slept a lot during the day.  Doc. 9-10 at 27.  Hodge was diagnosed with uncontrolled anxiety and stable schizophrenia.  Doc. 9-10 at 28–29.  He was cooperative, alert, and coherent with appropriate behavior and affect and logical, linear thought processes.  Doc. 9-10 at 29–30.

On August 10, 2021, Hodge saw Dr. Berenice Serpas at the Huntsville Family Health Center for chronic back pain from his car accident, nervousness, and chronic shakes.  Doc. 9-9 at 107.  Hodge was taking psychiatric medication given to him by his sister, apparently including Olanzapine and propranolol, though Hodge was not sure what he was taking.  Doc. 9-9 at 108.  Hodge had joint pain, back pain, and jerks in his left leg.  Doc. 9-9 at 109.  He reported depression and anxiety.  Doc. 9-9 at 109.  He had reduced range of motion and pain in his right hip and right knee.  Doc. 9-9 at 110.  He had good insight and judgment but was anxious.  Doc. 9-9 at 110.

On September 13, 2021, Hodge saw nurse practitioner Ian Kinzer at Wellstone Medical with a chief complaint that he had been "kinda sad since [his] brother passed."  Doc. 9-10 at 20.  Hodge's sister reported that otherwise Hodge had been "doing well," though he was "skiddish" and his legs were shaky.  Doc. 9-10 at 20.

Hodge reported frequently crying.  Doc. 9-10 at 20.  Hodge was diagnosed with uncontrolled anxiety and stable schizophrenia.  Doc. 9-10 at 22–23.  He was cooperative, oriented, alert, and coherent with appropriate behavior and affect and linear, logical thought processes.  Doc. 9-10 at 23–24.

On October 2, 2021, Hodge reported to the Crestwood Medical Center emergency department with hip pain and toothache.  Doc. 9-10 at 78.  Hodge had pain and decreased range of motion in his right leg.  Doc. 9-10 at 78.  He was alert, oriented, and had clear and appropriate speech and behavior.  Doc. 9-10 at 78, 81–82.  He was diagnosed with arthritis in his hip after imaging showed degenerative changes and prescribed Toradol.  Doc. 9-10 at 79, 84.  Hodge was ambulatory.  Doc. 9-10 at 82.  No cognitive or functional defects were noted.  Doc. 9-10 at 82–83.

On October 12, 2021, Hodge saw nurse practitioner Ian Kinzer at Wellstone Medical, reporting that he was "still depressed."  Doc. 9-10 at 14.  Hodge reported that he stayed in bed most of the time.  Doc. 9-10 at 14.  He was friendly and conversed appropriately with "no overt psychosis or mania."  Doc. 9-10 at 14.  Hodge was taking multiple psychiatric medications including Depakote, Lexapro, propranolol, and trazodone.  Doc. 9-10 at 15.  His depression was listed as "not controlled" and his schizophrenia was listed as "stable."  Doc. 9-10 at 17.  Hodge was cooperative, alert, and coherent with appropriate behavior, linear logical thought processes, and an appropriate affect.  Doc. 9-10 at 17.

On November 12, 2021, Hodge saw nurse practitioner Ian Kinzer at Wellstone Medical, reporting that he was not sleeping well.  Doc. 9-10 at 8.  Hodge reported that his mood had been "pretty good," denied depression, stated he was not having mood swings like in the past, denied hallucination, and denied paranoia.  Doc. 9-10 at 8.  Hodge was doing well but his sister reported that he lacked "motivation" and was not very active.  Doc. 9-10 at 8.  She reported that Hodge would go outside to smoke or take the dogs out, but otherwise spent most of the day "in his bed or on the couch."  Doc. 9-10 at 8.  His schizophrenia was "well-controlled" and he had not had significant behavior problems.  Doc. 9-10 at 8.  Hodge reported "chronic pain."  Doc. 9-10 at 9.  Hodge was taking multiple psychiatric medications including Depakote, Lexapro, propranolol, and trazodone.  Doc. 9-10 at 9.  Hodge's depression was listed as "controlled" and his schizophrenia was listed as "stable."  Doc. 9-10 at 10.  Hodge was cooperative with appropriate behavior, good orientation and alertness, and was coherent with linear but illogical thought processes.  Doc. 9-10 at 11.  He had appropriate affect, good attention and concentration, and limited judgment and insight.  Doc. 9-10 at 12.

On November 16, 2021, Hodge saw Dr. Warren Everett at the Huntsville Family Health Center for headaches and diarrhea.  Doc. 9-9 at 102.  He did not report any pain.  Doc. 9-9 at 102.  Hodge was taking psychiatric medication given to him by his sister, apparently including Olanzapine, propranolol, and trazodone, though

Hodge was not sure what he was taking.  Doc. 9-9 at 103.  Hodge had reduced range of motion and pain in his right hip and right knee.  Doc. 9-9 at 105.  He had good insight and judgment but was anxious.  Doc. 9-9 at 105.

On March 18, 2022, Hodge saw nurse practitioner Ian Kinzer at Wellstone Medical.  Doc. 9-10 at 128.  Hodge reported that he was not sleeping well.  Doc. 9-10 at 128.  Hodge had depressed mood and low energy.  Doc. 9-10 at 128.  A neighbor had called the police on him because he was stopping cars in the street to ask for money.  Doc. 9-10 at 128.  His psychosis was classified as partially controlled, with his depression not controlled.  Doc. 9-10 at 130.  His medication was adjusted to add Wellbutrin to his regimen that already included Depakote, propranolol, and trazodone.  Doc. 9-10 at 133.

On May 25, 2022, Hodge saw nurse practitioner Ian Kinzer at Wellstone Medical.  Doc. 9-10 at 123.  He reported that he spent most of the day in bed, was having auditory hallucinations, and had bad mood swings; he had poor judgment and impulse control and had a tendency to dig in the trash for food even though his sister made sure he was fed.  Doc. 9-10 at 123.  Hodge had not been taking his Depakote for two months.  Doc. 9-10 at 123.  His schizoaffective disorder was classified as not controlled.  Doc. 9-10 at 125.  He had mild poverty of speech but was otherwise oriented and appropriate.  Doc. 9-10 at 125.

**B.     Social Security proceedings**

**1.     Initial application and denial of benefits**

On December 7, 2020, Hodge applied for SSI benefits under Title XVI of the Social Security Act based on alleged disability due to bipolar disorder, schizophrenia, and delusions.  Doc. 9-4 at 2; Doc. 9-7 at 2–13.  In his application, Hodge alleged that he became disabled on June 1, 1998.  Doc. 9-4 at 2.  On August 11, 2021, Hodge's application for benefits was denied at the initial level based in part on a finding by agency consultant Gloria Roque, Ph.D. that Hodge had mild to moderate limitations and no marked or severe mental impairments.  Doc. 9-4 at 2–15.

On September 15, 2021, Hodge filed a request for reconsideration of the initial denial of benefits.  Doc. 9-5 at 11, 14.  On December 6, 2021, Hodge's application was again denied at the reconsideration level based in part on a finding by D. Glanville that Hodge had only moderate mental limitations and no marked or severe mental impairment, and a finding by Dr. Krishna Reddy that Hodge could perform work with some exertional, postural, and environmental limitations.  Doc. 9-4 at 16–27.

Hodge requested a hearing before an ALJ (Doc. 9-5 at 22), and a telephonic hearing was held on May 24, 2022 (Doc. 9-3 at 51–54).

On July 18, 2022, the ALJ issued an unfavorable decision, finding that Hodge

was not disabled under the Social Security Act.  Doc. 9-3 at 23–45.

## 2.  ALJ hearing

On May 24, 2022, the ALJ held a telephonic hearing on Hodge's application for SSI benefits.  Doc. 9-3 at 51–54.  During the hearing, Hodge testified that he lived with his sister, though she wanted him to move out because he drank her coffee. Doc. 9-3 at 55–56.  He testified that he was not working because he was "disabled," as he "broke [his] hip and pelvis in a car wreck, and [he] can't walk."  Doc. 9-3 at 55.  Hodge testified that he does not help his sister with chores, he just "l[ies] in bed and look[s] at the wall."  Doc. 9-3 at 56.  Hodge testified that he had no income and previously had been "on the streets for a long time" because he was homeless.  Doc. 9-3 at 56.  Hodge testified that he could not work because he could not "climb ladders no more and do stuff like that, yardwork, or anything like that . . . because [he] can't walk on [his] own," and he could not sit in hard chairs because it caused pain due to screws in his pelvis.  Doc. 9-3 at 57.  He testified that he can only sit for about 5 minutes before he has to get up and walk around.  Doc. 9-3 at 57.

Hodge testified that he had not worked since 2009, and that he could not do a job that allowed him to move between sitting and standing because he did not have an education, had only gone through seventh grade in school, and did not know how to read or write.  Doc. 9-3 at 58.  Hodge testified that he was schizophrenic and bipolar, and that he had dropped out of school because he got married in seventh

grade and had nine children, all of whom are now adults.  Doc. 9-3 at 58.  Hodge

testified that he and his wife were in a car accident in 2009 in which his wife had

died and which had left him "handicapped."  Doc. 9-3 at 59.  He stated that he had

not worked since the accident.  Doc. 9-3 at 59.  Hodge said he had not healed "much"

since the accident and still had "scars and everything all over [his] body."  Doc. 9-3

at 59.

The ALJ asked Hodge what he does all day and Hodge answered, "[n]othing,

just walk the streets . . . well I used to when I had a bicycle" but the bicycle "tore

up" so he traded it for a tent.  Doc. 9-3 at 60.  The ALJ asked if Hodge had been able

to ride a bicycle and Hodge said that he was "barely" able to do so because the gears

were "messed up" and it hurt his hip to ride.  Doc. 9-3 at 60.  Hodge testified that he

would previously ride his bicycle around the block, but it broke about a year prior to

the hearing and he could not ride it.  Doc. 9-3 at 60.  Hodge testified that previously

he had spent time sleeping outside in a tent and searching through garbage for food,

but that he would not be able to do that anymore because "[ly]ing on concrete hurts

[his] hip" and he cannot sleep at night.  Doc. 9-3 at 61.

Hodge testified that he was hospitalized for schizophrenia in December 2020

after his sister had him admitted.  Doc. 9-3 at 62.  He testified that he had been

receiving treatment for schizophrenia over the past year and was still receiving

treatment that included appointments to "get a shot in [his] arm."  Doc. 9-3 at 62–

63.  Hodge testified that he was having delusions, and that he saw and heard things including his dead wife, and that he had bad dreams and got scared at night.  Doc. 9-3 at 63.  Hodge testified that he had "pretty severe arthritis" in his left hip and degenerative disc disease in his lower back, and that his arms hurt all the time and his "brain hurts, because [he] got hit in the head with a crowbar" when someone tried to kill him three years prior.  Doc. 9-3 at 63.  Hodge testified that he could only stand for about 10 minutes at a time before he had to sit down due to pain, and that he could not walk around the block because he had breathing issues.  Doc. 9-3 at 64.  Hodge testified that he could not bend at the waist, crawl, squat, kneel, or fully extend his arms over his head due to pain.  Doc. 9-3 at 64.  He testified that he could lift a gallon of milk, but not repetitively, and that the only thing he did all day was lie in bed.  Doc. 9-3 at 65.  Hodge testified that he does not cook anything because he does not know how to cook and that he does not help with any chores at his sister's house.  Doc. 9-3 at 65.  He testified that he does not do any grocery shopping and does not do any socializing or go to church because all of his friends and family are dead.  Doc. 9-3 at 66.

Hodge testified that he is able to dress himself but sometimes falls down.  Doc. 9-3 at 66.  Hodge testified that he takes "a lot of medication" every night and every morning but did not know what he takes.  Upon questioning from the ALJ, Hodge testified that he had not always taken his medication the year prior, but that he was

compliant at the time of the hearing.  Doc. 9-3 at 67.  The ALJ asked whether Hodge "had any problems since [he] started taking his medicines again" and Hodge said, "[n]o, not since I got out of the hospital."  Doc. 9-3 at 67.  The ALJ asked what was keeping Hodge from working and Hodge said it was "mostly" his "hip and stuff hurting [him] all the time."  Doc. 9-3 at 67.  He said he could not climb ladders anymore because of his hip, which he used to do when he worked painting houses and as a handyman at an apartment complex where he worked for his rent.  Doc. 9-3 at 68.

Vocational Expert (VE) Debra Civils then testified that a hypothetical individual with Hodge's age and education and who could perform medium work with the limitations posed by the ALJ would be able to perform jobs in the national economy, including hand-packager, cleaner, and laundry worker.  Doc. 9-3 at 69–71.  Counsel for Hodge then asked the VE if a hypothetical individual who was off task 15% of the day and absent at least 2 days per month would be able to find employment and the VE said that employers typically only tolerated 10% off-task behavior and 1 absence per month.  Doc. 9-3 at 72.

### 3.    ALJ decision

On July 18, 2022, the ALJ entered an unfavorable decision.  Doc. 9-3 at 23. In the decision, the ALJ found "[a]fter careful consideration of all the evidence," including "the complete medical history consistent with 20 C.F.R. 416.912," that

Hodge "was not under a disability within the meaning of the Social Security Act since December 7, 2020, the date the application was filed."  Doc. 9-3 at 27.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 416.920(a); *Winschel*, 631 F.3d at 1178).  Doc. 9-3 at 27–28.  The ALJ found that Hodge had not engaged in substantial gainful activity since the application date of December 7, 2020, and had the following severe impairments:  "schizophrenia, depression, anxiety, trauma, borderline intellectual functioning, and osteoarthrosis."  Doc. 9-3 at 29.  In determining Hodge's severe impairments, the ALJ also considered that Hodge was obese, but found that his obesity did not qualify as severe.  Doc. 9-3 at 29.  The ALJ found that Hodge did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 9-3 at 21–22.  In determining that Hodge's mental impairments did not meet or equal any listed impairments, the ALJ considered the opinions of state agency consultants Roque and Glanville, found them persuasive, and found that Hodge had only moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and managing himself.  Doc. 9-3 at 32.

The ALJ determined Hodge's RFC (or residual functional capacity), finding that Hodge had the RFC to "perform medium work," except that he could

occasionally lift and/or carry including upward pulling of 50 pounds; could frequently lift and/or carry including upward pulling of 25 pounds; could sit for 6 hours in an 8-hour workday with normal breaks; could stand and/or walk with normal breaks for 6 hours in an 8-hour workday; could push and/or pull including operation of hand or foot controls without limitation; could lift and carry without limitation; could occasionally climb ramps and stairs; could occasionally stoop; could frequently kneel, crouch, and crawl; could not work on ladders, ropes, scaffolds, unprotected heights, or around dangerous machinery; could not work with heavy vibration; could learn, recall, and use information to perform uninvolved instructions and work-related procedures with a reasoning development level of 1 or 2; could not perform detailed tasks; could focus and concentrate on uninvolved instructions and tasks for 2-hour periods over an 8-hour workday and 40-hour workweek with normal breaks and without interruption of psychological symptoms; could relate to and work with supervisors, coworkers, and the general public on an occasional basis; and could only have infrequent changes in his work environment. Doc. 9-3 at 32–33.

The ALJ stated that the ALJ had considered all of Hodge's symptoms and the extent to which they reasonably could be accepted as consistent with the evidence. Doc. 9-3 at 33.  The ALJ also stated that the ALJ had considered any medical opinions and prior administrative medical findings in accordance with 20 C.F.R.

§ 420.920c.  Doc. 9-3 at 33.

In assessing Hodge's RFC and the extent to which his symptoms limited his function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities."  Doc. 9-3 at 33.

According to the ALJ, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 9-3 at 33.

The ALJ stated that "after careful consideration of the evidence" the ALJ found that Hodge's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Hodge's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  Doc. 9-3 at 33.

The ALJ then provided a detailed summary of Hodge's medical records.  Doc.

9-3 at 33.  The ALJ found that Hodge attended the emergency room with complaints of hip and low back pain after sleeping on the ground in December 2020 through March 2021 and had a history of a broken hip in 2009.  Doc. 9-3 at 33–34.  The ALJ found that Hodge was also seen for being noncompliant with his medication for his psychological conditions, and signed forms for voluntary admission to the hospital despite stating in his function report that he could not read.  Doc. 9-9 at 34.  The ALJ found that noncompliance with his medications resulted in Hodge talking fast and having a "bizarre affect."  Doc. 9-3 at 34.  The ALJ found that examination and imaging of Hodge's hip were largely normal, that he was ambulatory, and that at one point Hodge requested admission to the hospital because he was suicidal, but then had no suicidal plan and said he wanted to be admitted because it was cold outside.  Doc. 9-3 at 34.  The ALJ found that Hodge reported to the emergency room with hip pain, but had been helping his sister move plants and—despite rating his pain at an 8 out of 10—was in no apparent distress and interacted normally.  Doc. 9-3 at 34.  The ALJ also found that Hodge had gone to the doctor asking for pain pills at one point.  Doc. 9-3 at 34.

The ALJ then summarized Hodge's records from Wellstone Medical, finding that Hodge exhibited symptoms including delusions and disorganized presentation, and that Hodge stated that he had no trouble with reading or writing.  Doc. 9-3 at 34–35.  The ALJ found multiple inconsistencies in Hodge's records, including that

he denied substance abuse history but also reported previously using methamphetamine. Doc. 9-3 at 35. The ALJ summarized Hodge's visits to Wellstone Medical with psychiatric symptoms and the attempts to regulate his medication, then found that with medication Hodge was doing "okay" and then doing well as his medication regimen was adjusted, until Hodge was "doing well" and his schizophrenia was "well controlled" after he was "prescribed the right medication regimen." Doc. 9-3 at 35. The ALJ found that, while Hodge reported not doing as well in May 2022, he had not been taking his Depakote and still had good attention, concentration, and normal vocabulary and was well groomed, oriented, and coherent. Doc. 9-3 at 35. The ALJ found that, even when he presented for physical complaints, Hodge was alert, oriented, cooperative, appropriate, and in no acute distress. Doc. 9-3 at 35.

The ALJ summarized Hodge's consultative examination with Van Hise, finding that Hodge's functional status showed no difficulty sitting, standing, or walking. Doc. 9-3 at 35. The ALJ found that Hodge's ranges of motion and strength were normal, he had no difficulty performing various physical motions, he had normal gait and station, and he did not need an assistance device. Doc. 9-3 at 36. The ALJ found that Van Hise opined that Hodge had no limitations in sitting, standing, walking, lifting, or carrying, but could only lift 15 pounds continuously on both sides. Doc. 9-3 at 36. The ALJ stated that the ALJ did not consider any

opinions from Van Hise regarding Hodge's psychological limitations because psychology was not Van Hise's area of specialty.  Doc. 9-3 at 36.

The ALJ then provided a comprehensive summary of Bentley's psychological consultative examination, finding that Bentley stated that Hodge had PTSD after his 2009 car accident.  Doc. 9-3 at 36.  The ALJ found that Bentley opined that Hodge's impairment level for simple tasks and communication would be moderate and that most of Hodge's work-based restrictions would stem from his physical health problems rather than his psychiatric symptoms.  Doc. 9-3 at 36.

The ALJ found that Hodge's "allegations are not consistent with the evidence based upon this inconsistency with the objective medical evidence."  Doc. 9-3 at 36. The ALJ went on to find that, throughout the period at issue, "the medical evidence shows that when the claimant is compliant with medication, his mental symptoms improve," but that Hodge had not been taking his medication as directed at his most recent medical visit.  Doc. 9-3 at 37.  The ALJ found that, nonetheless, Hodge still had good attention and concentration, was neatly groomed, and was oriented and coherent.  Doc. 9-3 at 37.  The ALJ found that Hodge had only been hospitalized for his mental impairments once and on that occasion he left against medical advice, and that the record contained numerous inconsistencies including the following:  that Hodge said he was socially isolated but he went "to the mission," that Hodge said he spent all day in bed but the record showed that he engaged in activities such as

shopping for groceries, washing dishes, and going to the mission, that riding a bike and mowing the lawn were inconsistent with his professed hip pain, and that he purportedly went to Mobile and Pensacola looking for work but said he could not work.  Doc. 9-3 at 37.

The ALJ found that Hodge had low back pain and hip pain, but he routinely had normal medical examinations and imaging showed no disorder that would prevent medium work; the record also did not show a reason for surgery or a recommendation for physical therapy or other treatment modalities.  Doc. 9-3 at 37. The ALJ found that Hodge routinely had normal gait and station and normal examinations.  Doc. 9-3 at 37.  The ALJ found that, to the extent that Hodge sought to argue that a lack of treatment was due to financial constraints, such an argument was not persuasive.  Doc. 9-3 at 37.

The ALJ considered the third-party function report submitted by Hodge's sister, finding that Westrope claimed that Hodge could not work because he was like a child, but that she also reported that Hodge had no problems with personal care, though he needed reminders to shower, change clothes, and take his medication, and that he could make sandwiches but not cook.  Doc. 9-3 at 37–38.  The ALJ found that Westrope reported that Hodge did not know how to do things, went outside frequently, could shop for junk food, had hobbies including going fishing, tended to make no sense, and interacted poorly with other people.  Doc. 9-3 at 38.

The ALJ found Westrope's statement "probative, but not entirely persuasive," finding that Westrope lacked medical training to make medical observations, and that her statement was "largely inconsistent with the objective medical evidence and medical opinions of record as discussed more fully above."  Doc. 9-3 at 38.  The ALJ also stated that the ALJ could not "be confident that [Westrope's] statement was free of bias" because of her relationship with her brother, and that her statement could not "outweigh the accumulated medical evidence to find the claimant's impairments to be resulting in greater limitation than found in this decision."  Doc. 9-3 at 38.

The ALJ then assessed the medical opinions and prior administrative medical findings.  Doc. 9-3 at 38.  The ALJ again provided a detailed summary of Bentley's consultative examination, finding that Bentley opined that Hodge would have marked limitations in his ability to perform complex or repetitive work-related activities.  Doc. 9-3 at 39.  The ALJ found Bentley's opinion that Hodge would have marked limitations to be "partially credible," agreeing with the finding that Hodge could not perform complex work activities, but finding that the opinion about repetitive work was not persuasive because no part of the record supported that limitation.  Doc. 9-3 at 39.  The ALJ found that Bentley's opinion that Hodge would have moderate impairment in completing simple tasks and communicating with coworkers and supervisors was persuasive and consistent with the medical evidence

38

showing that, when Hodge was compliant with his medication, his symptoms improved.  Doc. 9-3 at 39.

The ALJ also considered the consultative examination of Van Hise.  Doc. 9-3 at 39.  The ALJ provided a detailed summary of Van Hise's examination and opinions and found them "probative but not entirely persuasive," finding that the opinion about the limitation that Hodge could only lift and carry an estimated 10 to 15 pounds was speculative and conclusory based on his normal examination, and that the opinion about Hodge's psychological limitations was likewise conclusory and speculative as it was not consistent with the record or Van Hise's examination.  Doc. 9-3 at 40.

The ALJ considered the opinions of the state agency consultants and found the opinions of moderate physical limitations persuasive.  Doc. 9-3 at 41.  The ALJ found that the opinions of state agency psychological consultants Roque and Glanville were not entirely consistent with the ALJ's findings because they lacked clarity, were vague, were not well explained or specific, and lacked sufficient information to usefully define Hodge's limitations.  Doc. 9-3 at 41.  The ALJ then more specifically examined and addressed the opinions.  Doc. 9-3 at 41–42.  The ALJ found that the opinions were "persuasive or not persuasive insofar as they are consistent with the evidence of record as a whole and support a finding that the claimant is 'not disabled.'"  Doc. 9-3 at 42.

The ALJ found that Hodge's "impairments are not incapacitating to the extent alleged," finding that Hodge testified and "understandably may honestly believe that his impairments are totally disabling," but the ALJ considered "the totality of all of the other evidence in the record" and found Hodge's allegations not entirely consistent with the evidence of record.  Doc. 9-3 at 43.

The ALJ then found that Hodge had no past relevant work and that, considering Hodge's RFC, age, education, work experience, and the testimony of the VE, Hodge was capable of performing jobs existing in significant numbers in the national economy.  Doc. 9-3 at 43–44.  Therefore, the ALJ found that Hodge had not been disabled under the Social Security Act since the December 7, 2020 application date through the date of the decision.  Doc. 9-3 at 44.

### 4.    Appeals Council decision

On July 26, 2022, Hodge appealed the ALJ's decision to the Appeals Council. Doc. 9-6 at 38–40.  On December 9, 2022, the Appeals Council denied Hodge's request for review of the ALJ's July 18, 2022 decision, finding no reason to review the ALJ's decision.  Doc. 9-3 at 7–11.  Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).

### DISCUSSION

Having carefully considered the record and briefing, the court concludes that

the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I. The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard." While Hodge argues in his brief that the ALJ failed to properly evaluate his complaints consistent with the Eleventh Circuit pain standard (Doc. 15 at 5–7), the ALJ's decision properly tracks the controlling law.

When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies. That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R. § 416.929 (standard for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [his] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to

41

whether [the claimant is] disabled."   20 C.F.R. § 416.929(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard.   In analyzing Hodge's RFC, and the extent to which Hodge's symptoms limited his functioning, the ALJ's decision reasoned that the ALJ "must follow" the required "two-step process":   (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 9-3 at 33.   The ALJ found at the first step of the pain standard that Hodge's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms."  Doc. 9-3 at 33.   The ALJ then proceeded to the second step of the pain standard and found that Hodge's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  Doc. 9-3 at 33.   Thus, the ALJ's decision properly applied the multi-part pain standard, and properly provided sufficient reasoning to demonstrate that the ALJ had conducted the correct legal analysis. *See* Doc. 15 at 3.

II.   **Substantial evidence supported the ALJ's decision to discredit Hodge's subjective testimony regarding his impairments and associated symptoms.**

Furthermore, substantial evidence supported the ALJ's decision not to credit Hodge's subjective testimony regarding his impairments and symptoms.

A.   **The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.**

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225. A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements." 20 C.F.R. § 416.929(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective. 20 C.F.R. § 416.929. Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his

43

precipitating and aggravating factors, his daily activities, the type, dosage, and effects of his medications, and treatments or measures that he has to relieve the symptoms.  *See* 20 C.F.R. § 416.929(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [his] symptoms."  20 C.F.R. § 416.929(c)(4).  If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar).  "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole."  *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[1]  "The question is not . . . whether [the]

---

[1] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of

ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

## B. The ALJ properly explained the decision not to credit Hodge's subjective testimony regarding his impairments and symptoms, and substantial evidence supported that decision.

The ALJ properly explained the decision to discredit Hodge's subjective testimony regarding his symptoms of his physical and mental impairments, and substantial evidence supported the ALJ's decision.

In his brief, Hodge argues that the ALJ improperly assessed Hodge's physical capability to perform medium work because objective records showed moderate to severe osteoarthritis and degenerative changes in Hodge's hip and back and Hodge frequently sought medical attention for pain in his hip and back. Doc. 15 at 8–10. Hodge also argues that the ALJ did not properly consider his mental impairments because the record was replete with symptoms of debilitating mental illness and because the ALJ mischaracterized and over-relied upon Hodge's daily activities, when the activities were actually very limited. Doc. 15 at 11–17. However, the

---

the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

ALJ's decision shows that the ALJ properly took the entire record into account without cherry-picking, and that the ALJ articulated explicit and adequate reasons for discrediting Hodge's testimony.  *See Cabrera*, 2023 WL 5768387, at *8 ("The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion.").  Moreover, review of the record shows that substantial evidence supported the decision.

The ALJ explicitly articulated the basis for finding Hodge's testimony not entirely credible.  The ALJ found that, while Hodge's underlying impairments could reasonably be expected to cause Hodge's alleged symptoms, Hodge's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record"—for reasons that the ALJ explained in the decision.  Doc. 9-3 at 33; *see supra* Background B.3 (ALJ decision).  The ALJ went on to find that Hodge's "allegations are not consistent with the evidence based upon their inconsistency with the objective medical evidence."  Doc. 9-3 at 36.  The ALJ also found that Hodge's "impairments are not incapacitating to the extent alleged" because, although Hodge testified and "understandably may honestly believe that his impairments are totally disabling," the ALJ considered "the totality of all of the other evidence in the record" and found Hodge's allegations not entirely consistent with the evidence of record.  Doc. 9-3 at 43.  Accordingly, the ALJ provided an explicit statement of the reasons for

discrediting Hodge's subjective testimony.  *Wilson*, 284 F.3d at 1225.

Moreover, the ALJ provided detailed bases in the record evidence for that articulation of the reasons not to fully credit Hodge's subjective testimony.  In determining Hodge's RFC (and citing 20 C.F.R. § 416.920c and SSR 16-3p), the ALJ stated that the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and considered any medical opinions and prior administrative medical findings.  Doc. 9-3 at 33.  The ALJ included information based on both objective and subjective evidence (*see* 20 C.F.R. § 416.929), providing detailed and lengthy summaries of Hodge's medical records, consultative examinations, and third-party function report, as well as Hodge's own allegations and testimony.  Doc. 9-3 at 33–43.

When providing that summary and considering the record, the ALJ did not shy away from finding elements of the record that could support Hodge's claim for disability; the ALJ found that Hodge had reported to the hospital multiple times reporting pain in his hip and back, that he presented to Wellstone Medical with delusions and disorganized presentation, and that his sister reported that he acted like a child.  Doc. 9-3 at 33–38.  However, the ALJ also found numerous facts in the record that undermined or were inconsistent with Hodge's allegations.  The ALJ found that Hodge had symptomatic psychosis on multiple occasions, but that those

occasions tended to occur when he was not compliant with his medication, and he reported doing "okay" or doing well when he was compliant with his medication. Doc. 9-3 at 34–35.  The ALJ further found that imaging did not tend to show severe injury to Hodge's hip or back, and that Hodge routinely had normal physical examinations, was ambulatory, presented relatively normally, and appeared in no acute distress despite reporting severe pain.  Doc. 9-3 at 34–37.  The ALJ found multiple instances of outright contradiction in the record, including conflicting evidence regarding Hodge's ability to read and write, conflicting evidence regarding past drug abuse, and conflicting evidence regarding Hodge's daily activities.  Doc. 9-3 at 34–37.  The ALJ also considered several instances in which Hodge reported to the hospital with alleged pain or suicidal tendencies, but upon follow-up questioning simply sought admission due to homelessness or sought pain pills.  Doc. 9-3 at 34.

The ALJ considered that Van Hise opined that Hodge had no difficulty sitting, standing, or walking, had no difficulty performing physical activities such as squatting, and had normal gait and station.  Doc. 9-3 at 36.  Additionally, the ALJ considered Bentley's opinion that Hodge's restrictions would stem more from his physical health issues than his psychological issues.  Doc. 9-3 at 36.

Not only did the ALJ engage in a lengthy and detailed recitation of the evidence of Hodge's condition and make an explicit finding of inconsistency, the

ALJ also did not entirely discredit Hodge's testimony about his symptoms.  Instead, the ALJ incorporated parts of Hodge's testimony in the RFC determination by limiting Hodge to medium work and providing additional restrictions including disallowing climbing of ladders—consistent with Hodge's testimony about his physical pain—and limiting him to uninvolved instructions and no detailed tasks, only occasional interaction with others, and infrequent changes in environment. Doc. 9-3 at 33.  Accordingly, the ALJ did not entirely discredit or discount Hodge's testimony.

In short, the ALJ's decision and RFC determination accounted for Hodge's credible subjective testimony regarding his impairments, related pain, and other symptoms, and included the necessary "explicit and adequate reasons" for discrediting Hodge's subjective testimony that he could not work on account of his alleged impairments.  *Wilson*, 284 F.3d at 1225.  The breadth of the ALJ's review shows that the ALJ "considered [Hodge's] medical condition as a whole," and the decision was not just a "broad rejection" of Hodge's subjective testimony.  *Dyer*, 395 F.3d at 1210.

Further, substantial evidence supports the ALJ's decision not to credit Hodge's subjective testimony.

While the court cannot "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner (*Winschel*, 631 F.3d at

49

1178), the record in this case is rife with information calling into question Hodge's subjective testimony.  As an initial matter, Hodge's medical records show at least two incidents in which physicians considered whether Hodge was simply malingering.  Doc. 9-9 at 29, 64.  The record also shows multiple instances in which Hodge reported to doctors or hospitals with complaints of pain, but was seeking pain pills, admission to get off the street, or other services.  Doc. 9-9 at 27, 51–52, 69–70, 112.

The record contains numerous instances of clear contradiction between Hodge's testimony regarding his condition and his condition as evidenced by objective and subjective evidence in the record.  Hodge testified that he could not walk (Doc. 9-3 at 55), but medical records show that he routinely was able to walk normally without assistance when he reported for medical care (*see, e.g.*, Doc. 9-9 at 27, 46, 71, 76; Doc. 9-10 at 82, 86, 98); Hodge also reported to Ian Kinzer that he had chronic pain but no mobility limitations (Doc. 9-10 at 33–34).  Hodge reported at least once that he never engaged in substance abuse (Doc. 9-9 at 87; Doc. 9-10 at 45), but also reported that he had a history of using crystal meth (Doc. 9-10 at 47).  Hodge stated multiple times that he did not go anywhere or socialize, but the records reflect that he spent time at "the mission" (Doc. 9-9 at 26–27; Doc. 9-10 at 101).  Hodge stated that he could read or write more than his name in his disability report (Doc. 9-8 at 2), and filled out a function report (Doc. 9-8 at 15–25), but also testified

that he could not read or write (Doc. 9-3 at 58). Hodge testified that he did not do any shopping (Doc. 9-3 at 66), but Hodge's sister reported in her third-party function report that Hodge could shop for junk food (Doc. 9-8 at 32). Hodge testified that he could not help his sister with chores (Doc. 9-3 at 56, 65), but medical records show that Hodge reported that he helped his sister with chores to stay busy (Doc. 9-10 at 7). Despite stating that he was unable to work (Doc. 9-3 at 56–57), Hodge also reported that at one point he went to Mobile and Pensacola to look for work, though he returned in part because he did not like the homeless shelters there (Doc. 9-10 at 39).

Contrary to the argument in Hodge's brief that the ALJ's "determination that [Hodge's] symptoms improved to the point that he would be able to sustain the mental demands of employment are not supported by substantial evidence" (Doc. 15 at 12; *see* Doc. 15 at 14 (similar)), the record also contains information, including Hodge's own testimony, indicating that his psychological impairments were greatly improved by medication. When he was not compliant with his mediation, Hodge suffered from evident psychosis, could not stay focused or have a conversation, and had hallucinations. Doc. 9-9 at 28, 38, 46, 53, 87, 93; Doc. 9-10 at 45, 49, 101–02. However, when he was compliant with his medication, Hodge presented much more normally and was alert and engaged with congruent thought process and no hallucinations or delusions. Doc. 9-10 at 7–10, 14–17, 20–24, 26–30, 33–35, 58, 67.

Between May and November 2021, Hodge regularly attended Wellstone Medical with relatively normal presentation and stabilized schizophrenia.  *See* Doc. 9-10 at 6–39.  Hodge frequently presented to hospitals and doctors' offices with clear speech, appropriate responses, and normal affect and orientation.  *See, e.g.*, Doc. 9-9 at 71, 76; Doc. 9-10 at 59, 82–83, 86, 105, 110, 119.  When Hodge began to have severe symptoms again, he also reported that he had not been taking his Depakote for two months.  Doc. 9-10 at 123.  Even then, Hodge was oriented and appropriate. Doc. 9-10 at 125.  Hodge also testified at his hearing that, since he started taking his medicines again, he had not had any mental problems, and that it was mostly his hip pain that kept him from working.  Doc. 9-3 at 67.  When Hodge underwent a mental consultative examination with Bentley while compliant with his medication, Bentley did note some mental-impairment-related limitations, but went so far as to opine that Hodge's work restrictions would stem more from his physical impairments—which would need to be addressed by a physician—than from his psychiatric symptoms. Doc. 9-10 at 68.  All of these facts offer support for a finding that, when he was compliant with his medication, Hodge's mental impairments were not as disabling as he alleged.  *See Werner*, 421 F. App'x at 939 ("The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it.").

In addition, the record contains evidence suggesting that, while Hodge clearly

experienced pain in his hip and back, his physical condition was not so extreme as to prevent him from performing medium level work with additional limitations. Imaging of Hodge's hip and back showed only mild degenerative changes or, at worst, moderate to severe arthritis.  Doc. 9-9 at 28; Doc. 9-10 at 66, 79, 84, 122.  He stated on multiple occasions that he could ride a bicycle and had only stopped because the bicycle broke (Doc. 9-9 at 46; Doc. 9-10 at 97; Doc. 9-3 at 60), and at one point he reported to the hospital that he had been helping his sister move plants (Doc. 9-10 at 89).  Upon examination of Hodge, consultative examiner Van Hise found that Hodge had no difficulty with sitting, standing, or walking, had no paraspinal tenderness and negative leg raise, had normal strength, dexterity, and sensation, and had no difficulty with gait and station or various physical tasks.  Doc. 9-10 at 61–63.  Van Hise opined that Hodge had no physical limitations beyond a limitation in continuously carrying more than 10 to 15 pounds per side.  Doc. 9-10 at 63.  Thus, the record contains evidence that Hodge's physical limitations were not disabling to the extent that he alleged.

While the record does also contain evidence supporting Hodge's alleged limitations, "[u]nder a substantial evidence standard of review, [a plaintiff] must do more than point to evidence in the record that supports [his] position; [he] must show the absence of substantial evidence supporting the ALJ's conclusion."  *Sims v. Commissioner of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017) (citing *Barnes*

*v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).  Here, the record—including the combination of the consultative evaluations, each of which found that Hodge's limitations would be primarily in the areas outside of the examiner's expertise, *see* Doc. 9-10 at 63, 68—includes sufficient facts to support the ALJ's RFC finding of medium work with additional restrictions and ultimate finding that Hodge was not disabled.  As explained above, substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford*, 363 F.3d at 1158.  In short, the record contains sufficient evidence of inconsistencies and weaknesses in Hodge's testimony about his symptoms and limitations that the ALJ was not "clearly wrong" to discredit Hodge's subjective testimony (*see Werner*, 421 F. App'x at 939), and that a reasonable person would accept as adequate to support the ALJ's finding (*see Crawford*, 363 F.3d at 1158).

As a final note, Hodge also includes—without development—an argument that the ALJ failed "to fully and fairly develop the record" (Doc. 15 at 18).  But that is not the case.  An ALJ "has a basic duty to develop a full and fair record." *Henry v. Commissioner of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015).  However, the claimant ultimately "bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R. § 416.912(a) ("[I]n general, you have to prove to us that you are . . . disabled.  You

must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled.").  And, notwithstanding the ALJ's responsibility to develop a "full and fair" record, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded."  *Graham v. Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997).  The Eleventh Circuit has instructed that "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice."  *Graham*, 129 F.3d at 1423 (quotation marks omitted).  Here, Hodge has provided no basis for the court to find prejudice and the record contains no clear evidentiary gaps; therefore, Hodge has not shown that the ALJ failed to fully and fairly develop the record.

Thus, substantial evidence supported the ALJ's decision in this case.  And the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings."  *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision.  The court separately will enter final

judgment.

      **DONE** and **ORDERED** this March 26, 2024.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE